NO. 4-06-0897     Filed 1/16/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: the Marriage of MARY ANNE REYNARD, n/k/a MARY ANNE SCHIERMAN, | ) ) | Appeal from Circuit Court of |
| Petitioner-Appellant, | ) | McLean County |
| and | ) | No. 01D113 |
| CHARLES G. REYNARD, | ) | |
| Respondent-Appellee. | ) | Honorable |
| | ) | James R. Glenn, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

This action involves a petition to modify maintenance payments from Charles Reynard to Mary Anne Reynard, now Mary Anne Schierman. The trial court denied the motion. Mary Anne appealed, requesting that this court increase her maintenance from $1,600 to $2,800 per month. We affirm.

I. BACKGROUND

A. The Original Maintenance Award

Though a more complete account of the facts surrounding the original award may be found in In re Marriage of Reynard, 344 Ill. App. 3d 785, 786, 801 N.E.2d 591, 592 (2003) (Fourth District), we sum up the original circumstances as follows.

Mary Anne and Charles married in 1969 and divorced in 2002, after 33 years of marriage. They had two children: Rachel, born in 1977, and Meghan, born in 1982. Mary Anne and Charles each began their respective careers as teachers, and soon Charles

began going to law school at night. In 1979, the couple moved from Chicago to Bloomington/Normal where Charles ran unsuccessfully for McLean County State's Attorney. Charles subsequently ran successfully for that position in 1988, 1992, and 1996. Mary Anne supported him through the elections and worked as a campaign manager. Through most of the marriage, Mary Anne worked part-time in the schools. She also enjoyed a successful stint selling country decorating supplies, grossing $20,000 in one year.

The divorce proceedings began in 2002. By the time of the divorce proceedings, Mary Anne had developed a medical condition known as fibromyalgia and had medical expenses in excess of $500 per month. Charles had just been elected a circuit judge, with an expected salary in excess of $136,000. Mary Anne was working full-time as a volunteer coordinator at a museum, making just over $29,000 per year. Mary Anne was also receiving $300 per month from a boarder. The couple's youngest daughter was a sophomore at Wellesley College in Massachusetts. Charles had paid for most of the college expenses and was willing to continue to do so.

The trial court divided the marital property, giving slightly more to Mary Anne. The total value of Mary Anne's share was $346,495. This included the marital residence, valued at $166,000 with no mortgage. Mary Anne also had $37,000 in nonmarital property. The total value of Charles' share was

$319,487.  This included two residential properties, one in Normal, Illinois, and one in Brentwood, Missouri.  The home in Normal was valued at $108,000, and had just under $22,000 in equity.  The residence in Brentwood was of similar value with a similar amount in equity.  Charles also had $106,771 in nonmarital property.  Lastly, the trial court determined that each party was entitled to 50% of the other's retirement benefits to be paid through a QILDRO (qualified Illinois domestic relations order).

The trial court set maintenance at $1,600 per month. The trial court ordered Charles to continue paying for Meghan's college expenses.  At that time, Charles was making payments in the amount of $2,900 to $3,400 per month.  The trial court stated it knew that Charles would have some difficulty meeting his financial obligations for a finite period of time, but that Charles was in a better position than Mary Anne to take out loans to meet those obligations.

The original maintenance award was set to terminate upon the first to occur of the following contingencies:  (1) the death of either party; (2) Mary Anne's remarriage; (3) Mary Anne's cohabitation with another person on a resident, continuing, conjugal basis; or (4) completion of the January 1, 2013, payment.  This court affirmed the original award, reasoning in part that Charles was paying two mortgages and a car payment,

as well as between $2,900 and $3,400 per month for Meghan's education, and therefore any higher amount would be unrealistic. Reynard, 344 Ill. App. 3d at 786, 801 N.E.2d at 592.

B. Changes Since the Original Award

On July 28, 2005, Mary Anne filed a petition to modify the order pursuant to section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act), stating that there had been a substantial change in circumstances since the original order was filed. 750 ILCS 5/510(a-5) (West 2004). Specifically, Mary Anne asserted that (1) Charles' income had increased; (2) Charles no longer had to pay for Meghan's college expenses; (3) Charles was no longer making one of the two mortgage payments; (4) Charles had remarried a working woman, presumably reducing his personal living expenses; and (5) Mary Anne no longer was receiving rent from a lodger, reducing her nonemployment income by $300 per month.

Since the original award, Charles' salary has increased to approximately $157,000. His total income from all sources exceeded $163,000. Charles' investment assets increased to $422,000. Charles has since remarried Judith Valente. They went to Greece on their honeymoon and hosted several wedding receptions, spending several thousand dollars. Charles had a joint account with Judith and placed about $800 per month in that account, but the exact value of the account is not in the record.

Charles owns a modest home, which at the time of the original award was worth $108,000 and had an 80% mortgage. Charles continued to make mortgage payments on the home. Charles testified that major improvements needed to be done on the home in order to approach the standard of living he had experienced prior to his divorce from Mary Anne. Charles put off making those improvements because he was hard-pressed to make his daughter's hefty tuition payments. Once the tuition payments tapered off, Charles put a great deal of money into his home, spending approximately $2,833 per month for capital improvements and $250 per month for home improvements. Including his mortgage and property taxes, Charles was spending approximately $4,257 per month on his house. Charles sold the second property in Missouri, which netted approximately $20,000. However, according to Charles, it was a mistake for this court ever to have allotted the mortgage payment from that property to Charles; he was not ordered to make said payments and never included said payments on his original financial affidavit.

Excluding the mortgage on Charles' current home, Charles has taken on about $68,000 of debt since the original award. Some of this debt is due to loans that Charles took on to pay for his daughter's education. The rest is debt from home repairs and a new Mitsubishi Gallant. Charles pays $1,360 per month on this debt. Charles' new financial affidavit indicates

- 5 -

that his monthly expenses, excluding the $1,600 maintenance payments, total $8,098.02.

Since the original award, Mary Anne's salary has increased to approximately $34,000, and her income from all sources has increased to $39,306. However, Mary Anne no longer has a boarder bringing in $300 per month. Mary Anne, who is now 59 years old, did not go back to school or take on additional employment.

Mary Anne sold the marital residence for $212,000 and, after closing costs, netted $206,700, which is $40,700 more than the marital property had been valued at in 2002. Mary Anne then bought a smaller home for $142,500. Upon the advice of her financial advisor, Mary Anne took out a mortgage on her new home and invested the proceeds from the sale of the marital residence. Mary Anne is required to make a mortgage payment of $280 per month but is actually paying off her mortgage at a rate of $500 per month.

Mary Anne's investment portfolio has increased in value from $194,162 to $375,606. However, this at least in part is due to the reallocation of assets after the sale of the marital residence. Mary Anne has taken three nice vacations since the original award: a trip to Thailand to visit her daughter who was living abroad, a trip to Finland for a close friend's wedding, and a trip to Boston for another wedding. Mary Anne has slightly

increased her monthly expenditures for entertainment, social clubs and the like, vacations, and gifts, for a total increase of $250 per month.

Mary Anne hopes to retire in approximately six years, by age 65. Mary Anne has been directly depositing $1,116 per month from her paycheck into a 403(b) retirement account. Mary Anne also contributes $416 per month to a Roth IRA. Mary Anne stated that her total monthly expenses were $4,132.

## C. The Trial Court's Ruling

At the close of evidence, the trial court stated that it had prepared an oral ruling. The trial court denied Mary Anne's motion to increase maintenance payments, finding that there had not been a substantial change in circumstances. The trial court found that Mary Anne's total income had increased from $31,141 at the time of the original maintenance order to $39,306, an increase of 26.22%. Charles' total income had increased from $143,965 to $163,733, or 13.73%. The trial court found that Mary Anne's monthly expenses had increased from $3,060 to $3,496, or 14.25%. The court did not include the extra $220 per month in excess of the required payment that Mary Anne made toward her mortgage, nor did the court include the $416 monthly contribution to the Roth IRA. The trial court found that Charles' monthly expenses, excluding the $1,600 maintenance payment, had increased from $7,027 to $8,473, or 20.58%. In

terms of assets, the trial court found the value of Mary Anne's real estate to have decreased by $58,000, or 34.9%. The court found the value of Charles' real estate to have remained steady. The value of Mary Anne's savings, retirement accounts, and investments increased from $194,162 to $375,606, or 93.45%. The value of Charles' savings, retirement accounts, and investments had increased from $350,392 to $422,772, or 20.66%. However, the trial court noted that it did not include the value of Charles' joint account with Judith Valente, because it did not have a figure for that account.

The trial court noted that Charles had accumulated $68,000 in debt since the original maintenance order. The trial court expressly rejected Mary Anne's argument that Charles' financial situation has improved now that he is no longer paying for Meghan's college. The trial court stated it had anticipated that Charles would have to borrow money to pay for Meghan's college in setting the original maintenance payment. The trial court stated that Charles was still paying off those loans. The trial court found the amount that Charles had estimated for the capital home improvements ($2,833 per month) to be reasonable. This appeal followed.

## II. ANALYSIS

Mary Anne argues that the trial court erred in denying her petition to modify, and requests that this court increase her

maintenance award to $2,800 per month.  As we stated previously:

> "'Maintenance issues are presented in a great number of factual situations and resist a simple analysis.'  [Citation.]  The trial court has discretion to determine the propriety, amount, and duration of a maintenance award. *** Section 504(a) of the [Act] sets forth factors the court must consider when determining the amount and duration of maintenance awards.  These factors include the income and present and future earning capacity of the parties; the needs of each party; any impairment of earning capacity due to devoting time to domestic duties or having forgone or delayed opportunities due to the marriage; the time necessary to acquire appropriate education, training, and employment; the ability of the party to support himself or herself; the standard of living established during the marriage; *** the age and physical and emotional condition of the parties; contributions and services by the party seeking maintenance to the education,

- 9 -

training, or career of the other spouse; and any other factor the court expressly finds to be just and equitable. [Citation.] ***

[T]he trial court must strike a balance that is reasonable under the circumstances in light of the goals of section 504." Reynard, 344 Ill. App. 3d at 790, 801 N.E.2d at 595, citing 750 ILCS 5/504(a)(West 2000).

In earlier times, where the only decree possible was one of judicial separation, where the wife was not allowed to own property in her own name, or where property was awarded to the person in whose name it was titled, usually the husband's, maintenance following a lengthy marriage was generally considered necessary. In re Marriage of Mayhall, 311 Ill. App. 3d 765, 767, 725 N.E.2d 22, 24 (2000) (Fourth District), citing 2 H. Clark, Domestic Relations §17.1, at 220 (2d ed. 1987); 1 H. Gitlin, Gitlin on Divorce §15-12, at 633 (2d ed. 1997). With the enactment of the Dissolution Act in 1977, the legislature sought to provide for the financial needs of the spouses through the disposition of property rather than through maintenance. Mayhall, 311 Ill. App. 3d at 768, 725 N.E.2d at 24. Under the Dissolution Act, the goal of maintenance was to enable a formerly dependant spouse to acquire financial independence for the future. Mayhall, 311 Ill. App. 3d at 768, 725 N.E.2d at 24. The

1993 amendments to the Dissolution Act made it easier for maintenance to be awarded, but maintenance is not the absolute right of every party to a marriage and should mainly be reserved for circumstances of necessity.  Mayhall, 311 Ill. App. 3d at 768, 725 N.E.2d at 24.

There is no requirement that a maintenance award equalize the parties' net disposable incomes.  Reynard, 344 Ill. App. 3d at 791, 801 N.E.2d at 596.  However, equalization of incomes may be appropriate in some cases, as marriage is a moral and financial partnership of coequals.  Reynard, 344 Ill. App. 3d at 792, 801 N.E.2d at 596, citing In re Marriage of Hart, 194 Ill. App. 3d 839, 853, 551 N.E.2d 737, 745 (1990) (J. Steigmann, specially concurring) (error for trial court to deny rehabilitative maintenance to wife who took care of domestic responsibilities over the course of a 20-year marriage to husband, a surgeon).  In affirming the original award in the instant case, this court held that the facts of this case did not rise to the level necessary to equalize the parties' net disposable incomes.  Reynard, 344 Ill. App. 3d at 792, 801 N.E.2d at 597.

The trial court's ruling on a request to modify or terminate maintenance will not be disturbed absent an abuse of discretion.  See In re Marriage of Pedersen, 237 Ill. App. 3d 952, 956, 605 N.E.2d 629, 632 (1992).  The burden is on the party

seeking the modification to show a substantial change in circumstances since the entry of the original maintenance award. <u>Pedersen</u>, 237 Ill. App. 3d at 956, 605 N.E.2d at 632; 750 ILCS 5/510(a-5)(West 2004) (requiring a substantial change and listing various factors to consider). A maintenance award can be modified either when the needs of the spouse receiving the payments change or the ability of the spouse making the payments changes. <u>Pedersen</u>, 237 Ill. App. 3d at 956, 605 N.E.2d at 632-33, quoting <u>In re Marriage of Garelick</u>, 168 Ill. App. 3d 321, 326, 522 N.E.2d 738, 742 (1988).

Mary Anne first argues that the trial court did not consider the proper statutory factors in coming to its decision. In addition to considering the statutory factors under section 510(a-5), concerning modifications, the trial court should also consider the factors set forth in section 504(a), as listed above, which it was required to consider in determining the original maintenance award. <u>In re Marriage of Zeman</u>, 198 Ill. App. 3d 722, 737, 556 N.E.2d 767, 775-76 (1990); 750 ILCS 5/504(a) (West 2004). Specifically, Mary Anne argues that the trial court failed to comment on the following findings of fact, as stated in our prior opinion:

> "Mary Anne made a significant
> contribution to the family during the
> parties' 33 years of marriage by working

- 12 -

part-time, raising the parties' children, and managing Charles'[] election campaigns. Mary Anne gave up her employment in Chicago to move to Bloomington/Normal for Charles'[] job as an assistant State's Attorney. She gave up her successful stint as a hostess for the sale of country decorating merchandise to be with her children. She campaigned for Charles during the 1979, 1988, 1992, and 1996 elections for McLean County State's Attorney. Although Mary Anne took all the requisite course work, she never obtained her teaching license." Reynard, 344 Ill. App. 3d at 792, 801 N.E.2d at 597.

Although the trial court must consider all the relevant statutory factors, it need not make specific findings as to the reasons for its decisions. In re Marriage of Kocher, 282 Ill. App. 3d 655, 661, 668 N.E.2d 651, 656 (1996). The same judge presided over both the 2002 proceedings, which led to the distribution of property and $1,600 maintenance award, and the 2006 proceedings concerning the petition to modify. The trial court did not reiterate the length of the parties' marriage or Mary Anne's contributions, but nothing indicates that it was not mindful of these factors. The court expressly stated that it had reviewed

the case file the day before and was "throughly familiar with the exhibits and the evidence."

Perhaps Mary Anne's most compelling argument that there has been a substantial change in circumstances is that Charles' college-payment obligations should have ended, or greatly lessened, by this point. At the time of the original order, Charles was paying between $2,900 and $3,400 per month for Meghan's college expenses. The record indicates that Meghan was in her sophomore year at Wellesley College during the November 2002 divorce proceedings and presumably would have been scheduled to graduate in Spring 2005. If Charles had been paying tuition at a rate of $2,900 per month since November 2002 and through the last date of hearing in the instant case, Charles would have made $134,400 in payments. This does not account for payments Charles presumably made during Meghan's freshman year in 2001. While we do not doubt that Charles has some remaining loans for Meghan's college, we do not believe he is continuing to pay those loans off at the rate of $2,900 to $3,400 per month. This observation is relevant because, in part, we affirmed the initial award of $1,600 per month because we believed that was all Charles was capable of paying, noting that a payment in excess of $1,600 would adversely affect Charles' ability to meet his own needs. Reynard, 344 Ill. App. 3d at 793, 801 N.E.2d at 597.

Nevertheless, we are reluctant to find a "substantial

- 14 -

change in circumstances" where the trial court contemplated and expected the financial change at issue. See In re Marriage of Hughes, 322 Ill. App. 3d 815, 818-19, 751 N.E.2d 23, 26 (2001). Here, the trial court was aware that Charles' college-payment obligations would lessen over time, and stated in its order that Charles' college-payment obligations had played out as the court had anticipated.

Likewise, the trial court noted that Charles' overall expenses had not decreased, in large part because of Charles' capital-improvement expenses. Charles had bought a relatively modest home and had put off making improvements until the college payment obligations lessened. For example, according to Charles' 2006 financial affidavit, Charles is paying $1,360 per month for debts in the amount of $68,000, which includes college payments, home-improvement payments, and car payments, but excludes the house mortgage. It is not clear what percentage of the debt payments go toward college payments as opposed to home-improvement payments or car payments. It is, however, clear that Charles' home-repair and capital expenses have in large part taken over the percentage of his income that used to be allotted for college expenses. Charles' financial affidavit allots $250 per month for home repairs and $2,833 for capital improvements. The trial court found these payments to be reasonable, and we cannot find it abused its discretion in so finding.

Even if we were to disagree with the trial court and find that at least some of Charles' extensive home-improvement costs were optional, and therefore find that Charles' disposable income has increased since the time of the original award, it would not necessarily follow that Mary Anne's maintenance should be increased. A party's increase in income is generally not sufficient to warrant modification of a maintenance award. See, for example, In re Marriage of Plotz, 229 Ill. App. 3d 389, 392, 594 N.E.2d 366, 368 (1992) (though made in reference to child support, the "sliding scale" approach should not replace the "substantial change in circumstances" approach to modification of payments). It is with this in mind that we approach the remainder of Mary Anne's claims that Charles' disposable income has increased, as have Mary Anne's expenses. The trial court's initial award carefully considered Mary Anne's contributions to the marriage, gave Mary Anne a hefty portion of the marital estate (valued at nearly $700,000), considered that Mary Anne still maintained a decent earning capacity, considered that Mary Anne was scheduled to be able to retire in 2013, and provided Mary Anne an additional $1,600 per month in maintenance so that she might continue to live a lifestyle that was close to the one she enjoyed during her marriage. Under these circumstances, to continually examine Charles' income, absent some showing of real need on the part of Mary Anne, would not allow for the "clean

break" that is desirable with the dissolution of a marriage.

This case is distinguishable from those other cases involving lengthy marriages cited by Mary Anne, where the trial court's nonexistent or very modest maintenance award was reversed. See Hart, 194 Ill. App. 3d at 853, 551 N.E.2d at 745 (error for trial court to deny $500 per month, two-year rehabilitative maintenance to wife who took care of domestic responsibilities over the course of a 20-year marriage to husband, a surgeon, and where divided marital assets were minimal); In re Marriage of Selinger, 351 Ill. App. 3d 611, 814 N.E.2d 152 (2004) (temporary maintenance award of $400 per month insufficient following a 25-year marriage where wife made $37,000 per year and husband made in excess of $100,000 per year, and where divided assets were less than $100,000). Nevertheless, we briefly address the remainder of Mary Anne's arguments.

Mary Anne contends that the trial court erroneously relied upon percentage gains to compare the parties' relative change in wealth and, in so doing, distorted the practical, real-world value of actual dollar amounts. The trial court, however, while admittedly using percentage amounts for illustrative and comparative purposes, did not rely solely on percentage comparisons. When questioned as to its use of percentages, the trial court stated: "Percentages are often used in Illinois law such as establishing child support. *** This court set

maintenance based on the circumstances of the parties that existed in 2002, and at that time [Charles] had greater financial means than [Mary Anne]. That is still the case, but I think percentages are a way of looking at how they both progressed[,] and both have progressed." Under the facts of this case, the trial court's approach was not unbalanced.

Mary Anne's contention that Charles has additional income due to his marriage to Judith Valente is without merit. First, we note that Charles' marriage to Judith did not in fact increase Charles' financial resources. Judith makes approximately $28,000 per year. However, Judith uses that money to pay for her own expenses, including a condominium in Chicago.

Similarly, Mary Anne's arguments that Charles is no longer making mortgage payments on a condominium and that Mary Anne no longer has a lodger bringing in $300 per month are not sufficient to constitute a substantial change in circumstances. Despite the fact that Charles is no longer paying for a second mortgage, the trial court found his monthly expenses to have increased. Although Mary Anne is no longer receiving $300 per month from a lodger, she is accruing interest at a higher rate after receiving a large profit from the sale of her marital residence. The bottom line is that neither party is accruing or expending money in exactly the same manner as they were at the time of the original award, but the overall income and net worth

of each party has increased.

Finally, Mary Anne argues that her expenses have increased. Mary Anne points to her mortgage payments, of which she is required to pay $280 per month, and instead pays $500 per month. Additionally, Mary Anne notes that she is hard-pressed to save for retirement, especially given that the maintenance payments are to end in 2013, around the time Mary Anne plans to retire. Mary Anne directly deducts $1,116 from her monthly salary to go into her 403(b) retirement account and adds an additional $416 per month to go into her Roth IRA. Mary Anne also complains that her medical condition (fibromyalgia) has worsened; however, in comparing Mary Anne's 2002 and 2006 financial affidavits, it does not appear that her medical expenses have increased.

The trial court did not err in its reasoned evaluation of Mary Anne's increased expenses. In considering the monthly expenses of a party in the context of a motion to modify maintenance payments, the trial court should consider whether the stated expenses are necessary or incurred by choice. See, for example, In re Marriage of Fazioli, 202 Ill. App. 3d 245, 250-51, 559 N.E.2d 835, 839 (1990). Here, Mary Anne was given the marital residence in the original division of property, then valued at $166,000. Mary Anne later sold the residence for $212,000, and, after closing costs, netted $206,700. Mary Anne

then bought a smaller home for $142,500. Though Mary Anne could have purchased the new home outright, she chose to take out a mortgage for tax and investment purposes, based on the advice of her financial advisor. Despite the fact that it was Mary Anne's choice to incur a mortgage expense, the trial court allowed the $280 required payment, but not the additional $220, to be counted toward Mary Anne's necessary monthly expenses. Likewise, the trial court allowed the $1,116 403(b) contribution as a necessary expense, but not the $416 Roth IRA contribution.

### III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's judgment.

Affirmed.

APPLETON, P.J., concurs.

MYERSCOUGH, J., dissents.

- 20 -

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent. I would reverse the trial court for a clear abuse of discretion. Mary Anne showed a substantial change in circumstances.

In the dissolution, the parties received roughly an equal division of marital property. Mary Anne did not receive a "hefty portion" as the majority states, but rather 52% in an attempt to equalize the gross disparity in the parties' income and the reduction in Mary Anne's maintenance because of Charles' payment of Meghan's college expenses. Charles no longer pays $2,900 to $3,400 per month to support Meghan in college. Since the dissolution, Meghan has graduated, Charles no longer has a mortgage on a condominium in Missouri, and Charles has received more than a $26,187 raise. At a minimum, considering no college expenses and the raise, Charles's income has increased $62,000. While this amount may not be as substantial to Charles with a salary of $163,733, it certainly is substantial to Mary Anne with a salary of $34,000 per year and maintenance of $1,600 per month.

The trial court here erroneously utilized a percentage comparison, analogizing to the child-support guidelines. Such a percentage comparison is nowhere recognized by statute or case law in the State of Illinois and is grossly unfair to the spouse of many years who has newly joined the workforce at an entry-level position and at a later age with little hope of promotion.

- 21 -

Gitlin has suggested a statistically average maintenance award 29% of the ex-husband's income or one-half.  H. Joseph Gitlin, Specifics of a Fair Divorce Settlement, Chi. Daily L. Bull., August 27, 2007, at 5.  This would entitle Mary Anne to roughly $53,000 or $62,000 a year in maintenance, a far cry from $19,200.

The majority's missive on maintenance relies on its own majority in Reynard, 344 Ill. App. 3d at 791-92, 801 N.E.2d at 596-97, to which I also dissented because of the gross disparity in the parties' incomes.  That disparity has merely increased exponentially four years later and will continue to increase with the cost-of-living adjustment (COLA) Charles received in July-- though he could not remember the figure (3.2% in 2006; 3.5% in 2007).  A similar COLA will be received each upcoming year by Charles.

The majority further unfairly criticizes Mary Anne because she mortgaged her new smaller, less-expensive home, and she contributes to a 403(b) and a Roth IRA.  The majority does not similarly criticize Charles's extensive home repairs and repayment of his loan to himself, instead recognizing these expenses as a replacement of college expenses.

The majority blithely ignores these substantial changes in income and expenses by stating:

"A party's increase in income is generally not sufficient to warrant modification of a

- 22 -

maintenance award.  See, for example, <u>In re</u>
<u>Marriage of Plotz</u>, 229 Ill. App. 3d 389, 392,
594 N.E.2d 366, 368 (1992) ***."  Slip op. at
14-15.

This is a misstatement of law unsupported by <u>Plotz</u> or any other case law or statute.  <u>Plotz</u> addressed child support and maintenance and an absence of a change in circumstances where only moderate increases in income were shown.  Such is not the case here where substantial changes in Charles' income and expenses have been shown.

Moreover, substantial increases in income as well as substantial decreases in income may constitute substantial changes to warrant a modification of maintenance.  <u>In re Marriage</u> <u>of Stone</u>, 191 Ill. App. 3d 172, 174, 547 N.E.2d 714, 715 (1989) (32% salary-increase factor favoring increase in child support); <u>Thurston v. Thurston</u>, 260 Ill. App. 3d 731, 733, 633 N.E.2d 118, 120 (1994) ("The reduction in the wife's income is substantial. That the wife reduced her expenses and standard of living to fit her compelled reduction in income does not render such reduction immaterial").

Finally, the trial court for the second time has again refused to consider appropriate statutory factors for the award of maintenance under section 504 of the Dissolution Act.

"In deciding whether a maintenance award

- 23 -

should be modified, a court should consider the same factors used in making an initial maintenance award.  (In re Marriage of Plotz (1992), 229 Ill. App. 3d 389, 391, 594 N.E.2d 366, 368.)  Under section 504 of the Act such factors include: '(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance; (2) the needs of each party; [and] (3) the present and future earning capacity of each party.' 750 ILCS 5/504(a) (1992); see also In re Marriage of Krupp (1990), 207 Ill. App. 3d 779, 793, 566 N.E.2d 429, 437."  Thurston, 260 Ill. App. 3d at 733, 633 N.E.2d at 120.

As previously stated in my prior dissent, the trial court has failed to recognize the disparity in earning potential and concomitant income inequality.

"Although Illinois law does not require an equalization of net disposable income in large-income cases (Claydon, 306 Ill. App. 3d at 902, 715 N.E.2d 1205-06), the needs of the parties must still be met where possible. While this couple did not live an extravagant

- 24 -

lifestyle so they could afford to send their children to college, they enjoyed substantial income, which should not be retained in large part by Charles, especially where, here, it was because of Mary Anne's sacrifices and significant contributions to the family during the parties' long marriage that Charles is able to have a greater earning capacity than does Mary Anne. As the majority points out[,] '[i]t is inequitable upon dissolution to saddle a party with the burden of her reduced earning potential and to allow the other party to continue in the advantageous position he reached through their joint efforts' (344 Ill. App. 3d at 792[, 801 N.E.2d at 596]), and that is what the trial court did in this case." Reynard, 344 Ill. App. 3d at 795, 801 N.E.2d at 599 (Myerscough, J., dissenting).

For these reasons, the trial court should be reversed.