# Illinois Official Reports

## Appellate Court

---

*In re Marriage of Virdi*, 2014 IL App (3d) 130561

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF NARVEEN VIRDI, Petitioner-Appellant, and PREM VIRDI, Respondent-Appellee. |
| District & No. | Third District<br>Docket No. 3-13-0561 |
| Filed | June 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a marriage dissolution action where petitioner initially was awarded a substantial amount of maintenance until respondent retired from his medical practice, the trial court did not abuse its discretion in denying her petition seeking to continue maintenance after respondent retired, since petitioner failed to manage the maintenance she had received to prepare for respondent's retirement and the termination of maintenance, and petitioner was not entitled to an award of attorney fees in view of her failure to substantially prevail in her attempt to modify maintenance. |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 93-D-41; the Hon. Frank R. Fuhr, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Stephen T. Fieweger, of Katz, Huntoon & Fieweger, P.C., of Moline, for appellant.

Kathleen Bailey, of Coyle, Gilman, Stengel, Bailey & Robertson, of Rock Island, for appellee.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Carter specially concurred, with opinion.

## OPINION

¶ 1      Petitioner, Narveen Virdi, and respondent, Prem Virdi, were married in 1970 and petitioned for dissolution of marriage in 1993. A judgment of dissolution was entered in 1998, which included an award of maintenance to Narveen. In August 2011, the trial court granted Prem's petition to modify maintenance from $10,000 a month to $1,500 a month; this court upheld that decision on appeal. *In re Marriage of Virdi*, 2013 IL App (3d) 120546-U. While that appeal was pending, Narveen filed a petition to modify the $1,500-a-month maintenance award, arguing that a substantial change in circumstances had occurred since that award was imposed. The trial court denied Narveen's petition to modify. Narveen appeals, raising two issues: (1) that the trial court abused its discretion in denying Narveen's petition to modify maintenance; and (2) this court should award Narveen attorney fees incurred for the present appeal. We affirm.

¶ 2      FACTS

¶ 3      During Prem and Narveen's marriage, Prem worked as an ophthalmologist in a shared practice. Narveen was a stay-at-home mother for the parties' one child. She earned master's degrees in literature and English from a school in India in 1970, but Prem and his family discouraged her from further pursuing her education. In 1990 Narveen purchased a banquet center called the Moline Commercial Club (Club). Narveen operated the banquet center along with a nonprofit agency referred to as "the Institute" and an art gallery called the Phoenix. The Club has operated at a loss every year since 1990.

¶ 4      In 1998 the court entered its judgment of dissolution. The judgment awarded Prem 47% of the net marital assets valued at $1.5 million. Narveen received 53% valued at $1.7 million. At the time of dissolution, Prem was 59 years old and Narveen was 49. The court ordered Prem to pay Narveen $4,000 a month in maintenance. The trial judge explained:

     " 'The Court is mindful of the fact that [Prem] is in a profession that requires not only a keen intellect but also fine motor skills to perform microsurgery. The Court therefore

finds that it would only be fair to order that [Prem] continue to pay maintenance until he retires from the practice. To order [Prem] to pay maintenance beyond the period that he is practicing would require him to pay maintenance out of his own property. Thus the Court finds that maintenance is to be permanent and shall terminate upon [Prem's] retirement from the practice of ophthalmology.' " *Virdi*, 2013 IL App (3d) 120546-U, ¶ 4.

In 2000, upon Narveen's request, and a showing of a substantial change in circumstances, the trial court modified the maintenance award to $10,000 a month.

¶ 5        In September 2009, Prem informed Narveen that he would be retiring from his practice in November 2009 and planned to stop making maintenance payments at that time. In December 2009, Prem filed a petition to terminate maintenance, asserting that the court's initial maintenance award required that maintenance would terminate upon Prem's retirement. After filing the petition, Prem stopped making maintenance payments. Narveen responded by filing a petition to continue maintenance.

¶ 6        The court held evidentiary hearings in September 2010, March 2011, and May 2011. The evidence established that after retirement, Prem's income had fallen from $198,000 a year to $78,000, comprised of social security benefits and proceeds from rental properties. Prem's net worth totaled approximately $3 million. Narveen's net worth totaled $1.4 million. Narveen had little income other than maintenance from Prem. When Prem stopped making maintenance payments in December 2009, Narveen began taking distributions from her retirement accounts. Narveen claimed expenses of $13,200 a month; Prem claimed his totaled $7,400 a month. Narveen owed $54,000 in back taxes on the Club.

¶ 7        The court found that Prem's decision to retire was made in good faith. In addition, the court found that the initial maintenance award was made in anticipation of Prem's eventual retirement. The initial award provided Narveen with sufficient funds to save for the looming reduction in maintenance that would accompany Prem's retirement. However, the court determined that the decrease in Narveen's net worth constituted a change in circumstances that justified continued maintenance. The court awarded Narveen maintenance of $1,500 a month, to terminate in three years unless either party filed a petition to review maintenance. Narveen appealed the court's decision. In September 2013, this court affirmed the $1,500 award but reversed the three-year termination period, making the award permanent. *Virdi*, 2013 IL App (3d) 120546-U.

¶ 8        On November 16, 2012, while Narveen's appeal of the $1,500 award was still pending, Narveen filed a petition to modify that award. The petition requested two modifications: (1) that the maintenance award be extended permanently; and (2) that the award be increased because Narveen's income was insufficient to meet her needs and Prem could afford to pay more in maintenance. The petition also sought attorney fees pursuant to section 508 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/508 (West 2012)).

¶ 9        The parties filed affidavits detailing their current financial situations. Narveen's affidavit listed her occupation as "Artist & Principal of 501(c)(3)," but listed the $1,500 in maintenance as her only income. Narveen claimed that she had $9,663 in monthly expenses, including $3,761 in mortgage payments and $1,850 in payments on real estate taxes for her Rock Island home (residence) and her condominium on Lake Shore Drive in Chicago (condo).

¶ 10        Narveen's assets included three properties: her residence, which she valued at $360,000 and owed $11,000 in taxes on; the condo, which she claimed to have bought for $525,000 (she

did not give a present value); and the Club, which she bought for $80,000 and made improvements of approximately $250,000. She estimated the present market value of the Club at $550,000, giving her equity of $330,000. As to financial assets, Narveen listed an individual retirement account (IRA) valued at $0.

¶ 11 As to liabilities, Narveen listed a mortgage on her residence of $181,000, with a monthly payment of $1,861; a mortgage on the condo of $325,000, with a monthly payment of $1,900; $7,000 in VISA credit card debt; and $18,000 in debt to a credit union.

¶ 12 Prem's affidavit listed his income at $6,835 a month, of which approximately $2,000 came from social security benefits and the rest came from rent generated by three rental properties. Prem estimated his monthly expenses to be $8,123, not including maintenance. He listed four pieces of real estate as assets: his residence in Moline and the three rental properties. He estimated their combined value at $735,000. He owed a combined $287,000 on the properties. Other assets included checking accounts of approximately $7,000; a money market account of $127,000; a retirement account with a present cash value of $1.1 million; and two life insurance policies with a combined cash value of $203,000. Prem also listed a 45% interest in real estate investment group called Global Vision Partners and a 33% interest in a real estate investment group called Global Vision Investors II.

¶ 13 The court held a hearing on Narveen's petition on May 21, 2013. Prem testified that in 2012 he took a $213,000 distribution from his IRA. His financial advisor testified that Prem takes a $10,000 withdrawal from his IRA every month for living expenses. Otherwise, his income is $6,500 a month from social security benefits and income from his rental properties.

¶ 14 Narveen testified that since filing her financial affidavit, her mortgage lenders foreclosed on her residence and her condo. In order to rescue her properties from foreclosure, she took out a loan of $396,000 from a private lender in May 2013. The terms of the loan note required that, by the maturity date of August 9, 2013, Narveen was required to repay the principal, plus a $20,000 "loan fee," a $5,000 "administrative fee," and interest accrued on the principal at 18%, for a total of $438,820. To secure the note, Narveen mortgaged the condo and the Club.

¶ 15 Narveen's income was comprised of maintenance and approximately $5,000 a year she earned from the Phoenix's art sales. Narveen was waiting until she turned 65 to apply for social security benefits, at which time she expected to receive $1,000 a month. Narveen testified that since maintenance had been reduced to $1,500, she had taken distributions from her retirement account, reducing it from $209,000 to $2,500. She used the withdrawals to pay back taxes on her properties and for living expenses. She testified that at least $31,000 went to pay for expenses for the Club. Most of the remainder of the withdrawals went to pay three years of unpaid real estate taxes on her three properties. Narveen testified that she paid $75,000 in back taxes on the Club and $10,000 for the condo.

¶ 16 During her testimony, Narveen disclosed that she had inherited a piece of property in India from her mother. She planned to sell that property to meet her obligations on the 18% loan. After selling the property and paying off the loan, Narveen would still owe roughly $180,000 on a mortgage from US Bank on her residence. Narveen was questioned about why she did not include the India property in her financial affidavit:

> "A. Yeah, but I was under the impression that inheritance is mine. It's got nothing to do with marital property. What I put was just marital property. ***

A. *** And I–I just left it blank because I felt that–I was under the impression that inheritance is really my business. It's not joint property. His inheritance is in his family. He inherited a lot of property, too. It's not part of it. That's his stuff, right? That's the way it–I was under the impression, so I just ignored it."

Narveen described the businesses she runs in the Moline Club building:

"Q. And when we were in court in March of 2011 you told us the Moline Club had not made a profit once since you've been operating it, right?

A. Correct. Still to this day.

Q. And has the Moline Club become more lucrative for you?

A. No, it's the same. I mean, in fact, it's actually more of a struggle now because so many other banquet facilities have opened up. The University Club has opened up. Now they're opening up another one.

Q. Is the Moline Club still open?

A. Yes.

Q. Why?

A. Well, because of the Institute, because of the Phoenix downstairs, and because we do have a few brides coming in. But it's reduced. We don't have scheduled hours; we only are by appointment, so we have an answering machine. That's all we have.

Q. What have you earned since March of 2011 from the Phoenix?

A. I don't have the numbers exactly with me. But, as I say, we make sales but we only keep twenty percent from the Phoenix.

Q. And that just covers the electricity?

A. Barely, yes.

Q. And so you're not–Is it fair to say you're not earning anything from the Phoenix?

A. For to take home, nothing.

Q. And what do you earn from the Institute?

A. Nothing. That's just community service.

Q. So the reason the Moline Club is still in operation is so that you can make nothing from the Phoenix Gallery and the Institute?

A. I'm sorry. I resent that question. I don't keep it open just to keep nothing. That's a community activity. This real estate value, if I can–I'm waiting for the train to come in, and then I could sell it. But, right now, I can't sell it. I can't just give it away. I've put twenty years of work in it. I expect that there is some value. I'm keep–I'm not keeping it open for nothing. There is–I'm doing social work. I'm doing a community service, and that is expensive. And I've been doing it for twenty years, and it's a matter of pride."

¶ 17    Narveen testified that the Institute had lost its nonprofit status (26 U.S.C. § 501(c)(3) (2006)) because of a mistake by her accountant. As a result, it was ineligible for most grants. Narveen hoped that once the section 501(c)(3) status was reinstated, she could apply for grants to fund the Institute and pay herself a salary. Narveen testified that she had been considering selling the Club. She received one offer to buy, but the buyer planned to demolish the building and build a parking structure. Narveen declined because the Club is an historic building and

"that's a social thing. You can't just tear it up." Narveen continued trying to sell the Club by word of mouth but had not received any other offers.

¶ 18    Narveen testified that since the last hearing on maintenance, she had not taken any steps to increase her income. She had not applied for any jobs and could not think of any that she would be qualified for. She had tried to sell her residence, but did not like her realtor. At the time of the hearing, she was attempting to market the residence by herself. Narveen testified that she does not have health insurance, because she cannot afford it. She does yoga to stay healthy but does not go to the doctor because she cannot afford it.

¶ 19    In addition to her obligations on the note, her mortgage, and real estate taxes, Narveen described an $18,000 liability she had from a credit union:

> "A. It was–It was from–for the art gallery. I purchased a vehicle for an art gallery, and then I tried to sell it, and I couldn't sell it. And–And then I let my chef–chef, manager kind of–I let her drive it, and she didn't maintain it. And it–it's now almost–I'm trying to sell it down. I'm getting a bid for $3,600. I really made a mistake with that. It was a miscalculation on my part."

¶ 20    The trial court denied the petition in a written order. The order explained that the parties' circumstances remained similar to those that existed when the court reduced maintenance to $1,500 a month. The court found that Prem remained retired and was receiving income from rent and social security, in addition to drawing on his IRA. As to Narveen, the court found that she continued to operate the Club at a loss. Although her retirement account had been depleted from $219,000 to $2,500, at least $30,000 of that was used to fund the Club. Narveen had turned down an offer to sell the Club because she disliked the buyer's plans for the building. Narveen had not pursued employment and had taken out a $438,820 loan at 18% interest to rescue both her Moline residence and Chicago condo from foreclosure.

¶ 21    The court ordered that Prem continue to pay $1,500 a month in permanent maintenance and awarded Narveen attorney fees in the amount of $4,673.70. The court noted that at the previous hearing, it had denied Narveen's request for attorney fees, finding that she had the ability to pay them herself. The court found that Narveen's ability to pay attorney fees had changed because of "her inability to manage her own finances."

¶ 22    Narveen appeals the trial court's judgment.

¶ 23                                    ANALYSIS

¶ 24    On appeal, Narveen raises two issues: (1) that the trial court abused its discretion when it denied Narveen's petition to modify maintenance; and (2) that this court should award Narveen attorney fees for prosecuting the present appeal under section 508(a)(3.1) of the Act (750 ILCS 5/508(a)(3.1) (West 2012)).

¶ 25                                 A. Maintenance

¶ 26    A trial court's ruling on the modification of maintenance will not be reversed absent an abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21 (2009). A court abuses its discretion where no reasonable person would have taken the view adopted by the trial court. *Id.* It is not our job to reweigh the statutory factors, and absent an abuse of discretion, we will not substitute our judgment for that of the trial court. *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1064 (2005).

¶ 27    A court may modify maintenance "only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2012). When determining whether a modification is appropriate, a court shall consider the following factors from section 510(a-5) of the Act:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/510(a-5) (West 2012).

¶ 28    In addition, the court shall consider the factors set forth in section 504(a) of the Act:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2012).

In reaching its decision, the court must consider all relevant statutory factors but need not make explicit findings as to those factors. *In re Marriage of Reynard*, 378 Ill. App. 3d 997 (2008).

¶ 29     In the present case, the court issued a written order denying Narveen's request to modify maintenance. The court found that from the time of the hearings on the previous petition to reduce maintenance, until the hearing on the present petition to modify, no substantial change in circumstances had occurred that would justify a modification of maintenance. Although the court did not explicitly cite to the section 510(a-5) or section 504(a) factors, its analysis reflects an appropriate consideration of those factors, and its decision was not an abuse of discretion.

¶ 30     Narveen claims that a substantial change in circumstances has occurred because she made withdrawals from her retirement account from $219,000 down to $2,500. In addition, Prem continues to withdraw from his retirement account in the amount of $10,000 a month. However, those changes do not constitute a change in circumstances sufficient to result in a modification of maintenance. Narveen's decision to withdraw from her retirement account was a result of her own lack of financial planning. As the court noted in its initial dissolution judgment, maintenance was initially ordered in anticipation of Prem's retirement. "[W]e are reluctant to find a 'substantial change in circumstances' where the trial court contemplated and expected the financial change at issue." *Reynard*, 378 Ill. App. 3d at 1005. From 2000 to at least September 2009, Narveen was receiving $10,000 a month in maintenance, some of which could have been used to plan for the inevitable reduction in maintenance that would accompany Prem's retirement.

¶ 31     In addition, Narveen has not pursued avenues to become self-sufficient. Instead, she has continued to operate the Club and the Institute at a consistent loss, and drained her retirement account to pay the property taxes. Although a party should not have to liquidate assets in order to survive (*In re Marriage of Keip*, 332 Ill. App. 3d 876, 882 (2002)), the assets in question here operate at a loss and Narveen can no longer afford them. When determining maintenance payments, a court should consider whether a party's situation is necessary or incurred by choice. See *Reynard*, 378 Ill. App. 3d at 1007. Narveen's commitment to community service is laudable, but the Act does not countenance that Prem should subsidize her community service 15 years after the dissolution of their marriage. By analogy, a court would not find a change in circumstances to necessitate an increase in maintenance if a petitioner were to give all his or her assets to charity.

¶ 32     Narveen also points to the distributions Prem has begun taking from his IRA as proof of a change in circumstances. However, Prem's distributions do not qualify as income for the purpose of calculating maintenance. The initial distribution of property took into account the parties' existing retirement accounts. In the years following, Prem chose to supplement his saving by investing his income, while Narveen used her savings to support a business that has not made any profit in over 20 years.

¶ 33     The purpose of the Act is to make the division of property the primary means of providing for the future needs of both parties. *In re Marriage of Brackett*, 309 Ill. App. 3d 329, 338 (1999). In the present case, the initial dissolution order provided Narveen with $1.7 million in property. That property has dwindled as a result of Narveen's choice to continue operating the Club at a loss rather than pursuing activities that would provide her an income. Narveen also failed to keep up with the property taxes on her various properties. In addition, for nearly 10

years, Narveen was receiving annual maintenance payments in six figures, which could have been used to prepare for her retirement. That is, Narveen's current situation is the product of her own financial mismanagement and choice. At dissolution, the court awarded her $1.7 million in assets. Additionally, since then Prem has paid her well over $1 million in maintenance. This amounts to a very comfortable "life jacket." She elected to throw off her life jacket and ride a sinking ship into the deepest abyss in the sea. Prem used the assets awarded him in the dissolution wisely; Narveen did not. Prem cannot be held to account for Narveen's business failures 20 years after the divorce. The trial court did not abuse its discretion in denying Narveen's petition to modify maintenance.

¶ 34                                B. Attorney Fees

¶ 35        Narveen requests that we award her attorney fees for prosecuting this appeal under section 508(a)(3.1) of the Act (750 ILCS 5/508(a)(3.1) (West 2012)). Prem responds by arguing that this court does not have jurisdiction to award attorney fees and that, even if it did, Narveen is not entitled to them.

¶ 36        Section 508(a)(3.1) allows a court to award attorney fees to a party for the prosecution of any claim on appeal on which the party has substantially prevailed. 750 ILCS 5/508(a)(3.1) (West 2012). Narveen has not substantially prevailed on her claim to modify maintenance. Therefore, she is not entitled to attorney fees under the statute.

¶ 37                                 CONCLUSION

¶ 38        The judgment of the circuit court of Rock Island County is affirmed.

¶ 39        Affirmed.

¶ 40        JUSTICE CARTER, specially concurring.

¶ 41        I agree with the majority's opinion in this case, except for the following two sentences in paragraph number 33: "This amounts to a very comfortable 'life jacket.' She elected to throw off her life jacket and ride a sinking ship into the deepest abyss in the sea." I do not join in that portion of the opinion.

¶ 42        For the reason stated, I specially concur with the majority's opinion.