2021 IL App (5th) 200402-U

NO. 5-20-0402

NOTICE
Decision filed 04/29/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.P. and J.P. | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 20-JA-7 |
| v. | ) | |
| | ) | |
| Kory P., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's determination that Father was unfit for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the minors was not contrary to the manifest weight of the evidence.

¶ 2    Respondent, Kory P. (Father), appeals from the judgment of the circuit court of Bond County finding he was an unfit person and terminating his parental rights to his two minor children, K.P. and J.P. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    K.P. and J.P. are the biological children of Father and Jamie M. (Mother), who is not a party to this appeal. K.P. was born on March 11, 2015, and J.P. was born on February

13, 2017. On May 1, 2018, the Illinois Department of Children and Family Services (DCFS) investigated a hotline call alleging that Father physically abused K.P. The DCFS investigator observed substantial bruising on the side of K.P.'s face. The investigator reported that Father admitted to "smacking" the minor, who was three years old, as a form of discipline. The DCFS investigator reported that Mother did not believe the incident was "that serious" and continued to allow Father to act as a caregiver to the children, as well as with a minor, O.M., Mother's child and the minors' half-sibling, born on July 16, 2009. Father was charged with aggravated battery in St. Clair County based on the incident of abuse against K.P. After Father's arrest, he became "hostile" in his holding cell and damaged a sprinkler, resulting in a charge of criminal damage to government property. The investigator indicated that one of K.P.'s siblings reported that Father hit Mother "all the time" and had put Mother in a choke hold.

¶ 5     On May 3, 2018, the State filed petitions for adjudication of wardship of the minors. With regard to K.P., the State alleged he was abused pursuant to section 2-3(2)(i) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(i) (West 2018)), in that Father inflicted physical injury to K.P. by "smacking" him in the face as a form of discipline, causing substantial bruising. The petition alleged Mother failed to protect K.P. from the physical abuse of Father. The petition also alleged that K.P. was neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)), in that his parents exposed him to an environment that was injurious to his health and welfare. With regard to J.P., the State alleged anticipatory abuse pursuant to section 2-3(2)(ii) of the Act (705 ILCS 405/2-3(2)(ii) (West 2018)), based on Father's abuse of K.P. and Mother's failure to

protect the minors. The State also alleged that J.P. was neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)), in that his parents exposed him to an environment that was injurious to his health and welfare. A shelter care hearing was held the same day. Following the hearing, the trial court found there was probable cause for the filing of the petitions. The minors were removed from the custody of their parents, and temporary custody was given to DCFS.

¶ 6    In an effort to correct the conditions that led to the children's removal from the home, DCFS created a service plan for Mother and Father. Father's service plan recommended that he (1) complete an integrated assessment, (2) complete a domestic violence assessment and complete 26 domestic violence classes as recommended, (3) complete a mental health assessment and engage in reoccurring individual counseling sessions as recommended, (4) complete an anger management assessment and engage in reoccurring anger management classes as recommended, and (5) complete parenting classes.

¶ 7    On May 7, 2019, the State filed amended petitions for adjudication of wardship for the minors, which added allegations that Father had pled guilty in St. Clair County to charges of domestic battery of K.P. and criminal damage to government property. That day, the court conducted an adjudicatory hearing on the petitions. Mother and Father stipulated to the allegations of neglect regarding the minors, and the remaining counts were dismissed. The court granted the State's petitions and adjudicated the children neglected, in that the minors were in an environment that was injurious to their welfare, based on Father's guilty plea to domestic battery of K.P.

3

¶ 8    On July 23, 2019, the circuit court entered permanency orders finding it was no longer necessary for the minors to be placed outside of the home. The court ordered that guardianship of the minors remain with DCFS, but the court restored custody of the minors to their parents. The change in the permanency status was based upon Mother and Father having completed all of their service plan tasks and the family's successful unsupervised and overnight visitation. The court found that Mother and Father had made reasonable efforts and reasonable progress toward the return of the minors to the home. At this time, Mother and Father were living with Father's mother in Bond County.

¶ 9    On September 3, 2019, DCFS filed a "protective custody court report" with the court. The report stated that on August 27, 2019, O.M. called Ann Whalen, the caseworker, and stated O.M. had seen Father hit K.P. on the buttocks and slap K.P. across the face for accidentally breaking a glass. O.M. was upset and reported being afraid to be in the home. Whalen was out of the area, so she reported the incident and requested assistance from another caseworker. A DCFS caseworker and an investigator responded to the home and discovered marks on K.P.'s buttocks and a bruise on the right side of his head. The children were removed from the home that evening. The following day, "major bruising" was documented on K.P.'s buttocks and K.P. reported to a physician that Father had "beaten him." The day after the incident, Father texted Whalen denying that he had hit K.P. and indicating that he did not understand what was happening, other than O.M. "deciding to make a phone call" because she did not want to be at home. In the following days, O.M. reported to Whalen that Father said the children would never be able to return home and that Mother told O.M. that it was O.M.'s fault the children were removed from the home.

¶ 10 On September 5, 2019, DCFS filed motions to modify the permanency orders entered on July 23, 2019, based on the August 27, 2019, incident of abuse against K.P. That day, the court conducted a hearing on DCFS's motions.

¶ 11 On September 10, 2019, the court entered an order finding Mother and Father were unfit to care for, protect, train, or discipline the minors and that the minors' health, safety, and best interest would be jeopardized if they remained in the custody of their parents. Based on the evidence presented, the court found that it was more likely than not that Father had slapped and spanked K.P. as alleged in the report filed by DCFS. The court found that the parents had failed to complete aftercare services and continued committing acts similar to those that originally brought the minors into care. The court also found that DCFS had made reasonable efforts to reunify the family but that those efforts had been unsuccessful due to the parents' conduct and failure to complete aftercare services. The court concluded that it was necessary to place the minors outside of the home, granted DCFS's motion, and placed custody of the minors with DCFS. In October 2019, Mother and Father were still living in Bond County when Mother gave birth to another child, who was taken into protective custody.

¶ 12 On March 10, 2020, the court held a permanency review hearing, at which Mother and Father were present. That day, the court entered a permanency order setting the permanency goal as returning the children home within 12 months. The minors had been placed with their maternal grandmother and were doing well in the placement. The court found that the services contained in the service plan were appropriate and had been provided to the parents. The court found that Mother was visiting the children and had

5

completed her integrated assessment, domestic violence classes, and mental health services but that Mother needed to complete a new domestic violence victim assessment and a psychological assessment. The court found that Father had previously completed all of his recommended services but had agreed to re-engage in domestic violence classes. The court noted that Mother and Father were still in a relationship despite the presence of domestic violence and that there was a no-contact order issued in Bond County against Father with regard to the children. The court observed that the juvenile proceedings were going to be transferred to Bond County. The permanency order was signed by Mother, Father, and the caseworker. On March 25, 2020, K.P. and J.P.'s cases were transferred to Bond County.

¶ 13    On July 24, 2020, the circuit court of Bond County held a permanency review hearing and entered a permanency order finding the appropriate permanency goal was the return home of the minors within 12 months. The court found Mother was attending services and making reasonable efforts toward the return of the minors but that she had not yet made reasonable progress toward their return. The court found Father had not made reasonable efforts or reasonable progress toward the return of the minors because Father was not participating in any services. The court found the services contained in the service plan were appropriate and reasonably calculated to facilitate the return of the minors to the home, that the required services had been provided to the parents, and that DCFS had made reasonable efforts to provide the parents with the recommended services.

¶ 14    On August 7, 2020, the State filed petitions to terminate Father's parental rights to the children. The petitions alleged that Father was unfit based on three statutory grounds: (1) he abandoned the minors (750 ILCS 50/1(D)(a) (West 2020)), (2) he deserted the

6

minors for more than three months next preceding the commencement of the proceedings (750 ILCS 50/1(D)(c) (West 2020)), and (3) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)).

¶ 15    On October 23, 2020, the court held a fitness hearing. At the hearing, Ann Whalen testified she was a caseworker with Caritas Family Solutions and that she had been the family's caseworker since the inception of the case in St. Clair County in May 2018. Whalen testified the children came into care after Father admitted he "smacked" K.P. as a form of discipline, leaving a handprint on K.P.'s face. Father was subsequently charged with domestic battery in St. Clair County for the incident. Father pled guilty and was placed on probation, which he did not successfully complete.

¶ 16    Mother and Father each completed an integrated assessment when the case was initiated, and Whalen created a service plan for the parents. Father's recommended services were to (1) complete an integrated assessment, (2) complete a domestic violence assessment and follow any recommendations, (3) complete a mental health assessment and follow any recommendations, (4) complete anger management classes, and (5) complete parenting classes. Whalen testified that Mother and Father completed the recommended services, and the children were returned home on July 23, 2019. Although custody had been restored to Mother and Father, DCFS retained guardianship of the minors, and Whalen conducted weekly meetings with the family.

¶ 17    Whalen testified that approximately a month after the children were returned home, O.M. contacted Whalen and reported that Father had "smacked" K.P. again for accidentally

7

breaking a glass. Whalen testified the report was investigated, and it was determined that Father had hit K.P. across the face and on the buttocks, resulting in bruising. Father was charged with domestic battery in Bond County for this incident. Father pled guilty to the charge and was sentenced to three years in the Illinois Department of Corrections, a sentence he was currently serving.

¶ 18    Whalen testified the children were removed from the home after the second incident of physical abuse by Father, and a no-contact order was entered between Father and the children. Whalen testified that she created another service plan for Father and that Father's recommended services were the same as his initial service plan. Whalen requested that Father repeat the recommended services because his actions demonstrated that "he had not learned anything" from his initial services. Whalen testified that Father had not engaged in, or completed, any services since the children were taken back into custody in August 2019. Whalen testified that, in the last 14 months, Father had failed to complete services related to his issues regarding domestic violence, mental health, anger management, or parenting. Whalen testified she encouraged Father to engage in services but that he has not availed himself of any services, and that Father's overall performance on his service plan was unsatisfactory.

¶ 19    Whalen acknowledged that the coronavirus interfered with the provision of some services from mid-March 2020 through the end of August 2020. Whalen testified that Father was currently incarcerated at the Vandalia Correctional Center, which offers domestic violence services and counseling, mental health treatment and counseling, anger management, and parenting courses. Whalen stated that Father had not reached out to her

from July 23, 2019, to October 23, 2020, to request any type of services, and she was not certain whether these services had been made available to Father while he was incarcerated.

¶ 20 Father testified that he never received a service plan after the children were removed from the home in August 2019 and that he did not know what services he was expected to complete. Father testified that he requested a service plan and referrals for services "at least three [times]" after August 2019, asserting he made these requests of Whalen via text message and in person when he saw Whalen at court dates. Father testified that he almost never received a reply from Whalen and that Whalen informed him that he could not participate in services due to the no-contact order.

¶ 21 Father acknowledged telling Whalen that the court was making him "look like a monster" and that "it [wasn't] like [he] abused the kids all the time. It only happened twice." Father asserted he was willing to participate in services and that he completed a second integrated assessment following the children's removal in August 2019. Father acknowledged that he had not participated in any services since the second removal of the children from the home but asserted this was because he was waiting for Whalen to provide him with a new service plan, he did not receive any referrals for services, and he was prevented from participating in services due to the coronavirus. Father also testified that he could not contact Whalen after he was incarcerated on July 2, 2020, because he did not have Whalen's phone number. Father testified he did not engage in any services prior to his incarceration in July 2020, despite his ability to do so.

¶ 22 Based on the evidence presented, the trial court made a verbal finding that the State had proven by clear and convincing evidence that Father was unfit for failing to make

reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following the adjudication of neglect.

¶ 23    The cause immediately proceeded to the best interest hearing. At the hearing, Whalen testified that the children and O.M. have been placed with their maternal grandparents, Sandra and James, since August 2019. Whalen stated the children were familiar with the home and are very affectionate with and strongly bonded to their grandparents. Sandra acts as the children's primary caregiver, and the children are doing well in the placement with all of their needs being met. Whalen testified that Mother has been visiting the children and making progress on her service plan. Whalen testified that she believed it was in the children's best interest to remain with their maternal grandparents until they can be returned home to Mother. Whalen testified that Father visited the children a couple of times a week when they had been removed from the home the first time but that Father has been prohibited from having any contact or visits with the children since August 2019 due to the no-contact order. Whalen testified that Father has not asked her about the children since their second removal from the home.

¶ 24    Father testified that Whalen was not accurately representing his interest in the children. Father stated he has asked Whalen how he can participate in services and visits but that the no-contact order prohibited all contact. Father acknowledged that he has never requested that the no-contact order be lifted. Based on the evidence, the court made a verbal finding that the State had proven by a preponderance of the evidence that it was in the best interests and welfare of the minors that parental rights of Father be terminated.

10

¶ 25    On November 6, 2020, the circuit court entered a written order terminating Father's parental rights. The court found by clear and convincing evidence that Father was an unfit person for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following the adjudication of neglect. The court also found it was in the best interests of the children that Father's parental rights be terminated. This appeal follows.

¶ 26                                        ANALYSIS

¶ 27    Section 2-29 of the Act sets forth a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). First, the State must prove by clear and convincing evidence that the parent is an unfit person as defined by the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent to be unfit, the court must then determine whether the State has proven, by a preponderance of the evidence, that it is in the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). During the second stage of the proceedings, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008).

¶ 28    The trial court's decision to terminate parental rights involves factual findings and credibility assessments which, on review, are accorded great deference. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). On appeal, the trial court's findings of parental unfitness and that termination of parental rights was in the child's best interests will not be disturbed unless

11

they are contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998, 1001 (2004).

¶ 29 Here, the trial court concluded that the State had proven one ground of unfitness against Father, that Father failed to make *reasonable efforts* to correct the conditions that were the basis for the removal of the minors during any nine-month period following the adjudication of neglect pursuant to section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)). On appeal, Father argues the circuit court erred in finding that he was unfit for failing to make *reasonable progress* toward the return of the minors in any nine-month period following the adjudication of neglect pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 30 The failure to make reasonable progress toward the return of a child and the failure to make reasonable efforts to correct the conditions that were the basis for removal, are two distinct grounds for a finding of parental unfitness and require a different analysis. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). Father has failed to correctly identify the basis of the circuit court's ruling and, as a result, he has not presented this court with relevant legal authority or arguments supporting reversal of the trial court's order finding him unfit. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires a party to support their arguments on appeal with specific facts and citation to relevant authority. Father's failure to present relevant argument and authority violates Rule 341 and results in Father's forfeiture of consideration of the issue. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 72. The circuit court's judgment can be affirmed based on Father's forfeiture alone.

12

¶ 31 Moreover, based on this court's review of the record, we conclude that the circuit court's order finding Father unfit for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the minors was not against the manifest weight of the evidence. "Reasonable effort" is a subjective standard and refers to the amount of effort reasonable for the particular parent. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions the led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 32 In this case, the conditions that were the basis for the removal of the minors from the home was Father's physical abuse of K.P. and Mother's unwillingness to protect the minors from Father's abuse. In an effort to correct these conditions, Whalen created service plans for Mother and Father. Father's initial service plan recommended that Father engage in mental health services and complete classes for domestic violence, anger management, and parenting issues. Although Father completed these services and the children were returned home, the fact that Father physically abused K.P. again shortly after his return home demonstrates that Father's initial completion of these services did not correct the conditions that were the basis for the removal of the minors. As a result, Whalen created a new service plan, with the same recommended services as the initial plan, with the goal of correcting the underlying condition, specifically Father's physical abuse as a means of discipline, resulting in physical injuries to his young child.

¶ 33 There is no dispute that Father had not engaged in any services in the 14-month period after the children were removed from his care on August 27, 2019, through the date

13

of the hearing on October 23, 2020. We find Father's excuses for his lack of effort to be unavailing. Father's contention that he did not know what services DCFS recommended that he complete is disputed by Whalen's testimony and the record. On March 10, 2020, approximately six months after the second removal, the court held a permanency review hearing and entered a permanency order. In the order, the court found that the services contained in the service plan were appropriate and had been provided to the parents. The court also found that Father had agreed to re-engage in domestic violence classes despite having previously completed all services. Father was not only present at the hearing but also signed the court's order.

¶ 34     Although the coronavirus caused some disruption of services between mid-March and September 2020, Father has presented no credible explanation for his failure to attempt to engage in any services, at any point, in the 14-month period between August 27, 2019, and October 23, 2020. The conditions that were the basis of the children's removal, primarily Father's physical abuse, clearly persisted and Father made no effort to correct those conditions following the second documented instance of abuse in August 2019. The record is clear that Father has not made earnest and conscientious strides toward correcting the conditions that led to the removal of the children. Based on the evidence, the circuit court's determination that Father was unfit for failing to make reasonable efforts to correct the conditions that were the basis for removal of the minors during any nine-month period following the adjudication of neglect was not against the manifest weight of the evidence.

14

¶ 35                                  CONCLUSION

¶ 36    For the foregoing reasons, we affirm the judgment of the circuit court of Bond County.

¶ 37    Affirmed.